**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DONNA LEE MUNOZ,

       Plaintiff,

v.                                                CV 13-257 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Donna Munoz filed an application for Supplemental Security Income ("SSI") on January 25, 2010. (Administrative Record ("AR") 9.) She alleges disability beginning on September 16, 2007, due to chronic back pain and insomnia. (AR 187, 216.) Administrative Law Judge ("ALJ") Mary Johnson held a disability hearing on January 6, 2012. (AR 7-40.) On January 24, 2012, the ALJ determined that Munoz was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 44-52.) Munoz filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-6.)

Munoz sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Remand to Agency for Rehearing (Doc. 19). The Commissioner of the SSA ("Commissioner") responded (Doc. 20), and Munoz filed a reply (Doc. 22). After having read and carefully considered the entire record and the relevant law, I grant Munoz's motion and remand this case to the SSA for proceedings consistent with this opinion.

STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. § 416.920(a)(4). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to those in the Listing of Impairments, then, as part of step four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. § 416.920(e). In the fourth step, the ALJ compares

2

the claimant's RFC with the functional requirements of her past relevant work to see if the claimant is still capable of performing her past work. *See* 20 C.F.R. § 416.920(f). If a claimant is not prevented from performing her past work, then she is not disabled. *Id.* If the claimant cannot return to her past work, then the Commissioner must show at the fifth step that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail). The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987).

## FACTUAL BACKGROUND

Munoz is a fifty-year old woman with a GED. (AR 187, 217.) She has worked as a cashier, day laborer, maid and in inventory control. (AR 191.) Munoz discontinued work on September 16, 2007, her alleged disability onset date, due to her medical conditions. (AR 216.)

The medical records in the AR date back to August 16, 2005. (AR 294.) Munoz's earliest records reflect abdominal pain and abnormal vaginal bleeding. (*See* AR 264, 280, 294, 306.) She previously had a tubal ligation (*see* AR 267), and on October 3, 2005, Dr. Victor Nwachuku, M.D., scheduled Munoz for a total abdominal hysterectomy and bilateral salpingo-oophorectomy. (AR 280, 321.) Munoz experienced further abdominal pain caused by a large gallstone diagnosed on April 25, 2007. (AR 307.) Her gallbladder was removed that same year. (AR 321.)

On February 22, 2008, Munoz visited Marlene Baska, P.A., complaining of an approximately six-month history of pain in the ribs below her right breast. (AR 262.) A

mammogram showed a 7.0 to 8.0 mm low density nodule close to the chest wall in the central portion of the left breast. (AR 300.) Baska provided Munoz with pain medication. (AR 262.) On March 12, 2008, Munoz again complained of pain under the right breast area. (AR 261.) Baska noted that Munoz would be scheduling an appointment for chronic pain therapy, and she provided Munoz with additional pain medication at that time. (*Id.*)

On October 21, 2009, Munoz saw Naomi Clancy, M.D., who would become her primary care provider, for the first time. (AR 308.) Munoz, who is 5'4", weighed 227 pounds and complained of pain under her right breast. (AR 254, 262, 308.) A mammogram revealed a minimally dense breast perenchyma in the region of accessory nipples. (AR 317.) Munoz continued to visit Dr. Clancy periodically through April 2010 for breast pain. (See AR 312-14, 351, 367, 370-71.) While an MRI showed degenerative disc disease at T9-T10, and Dr. Clancy explained to Munoz that this disc disease might be causing the pain under her right breast, Munoz was eager to have her accessory nipples removed. (AR 368, 371.) On April 14, 2010, Munoz had a right breast mass excisional biopsy done by Frederick Wendler, M.D. (AR 356.) Dr. Wendler ruled out any malignancy. (*Id.*) Dr. Wendler noted that she wanted to proceed with the removal of her left accessory nipple once the right one had healed. (*Id.*) He performed a left breast mass excisional biopsy on October 12, 2010, finding no malignancy. (AR 410.)

As noted in conjunction with records focusing on mastalgia, Munoz also suffered long-term pain in her back, with her earliest records in the AR dating back to January 18, 2007. On that date, Marvin Hill, M.D., conducted an MRI of Munoz's lumbar spine without contrast. (AR 439.) Dr. Hill found that Munoz had a right-sided disc protrusion at L3-L4, a left paracentral disc protrusion at L5-S1, degenerative disc disease diffusely, and a right foraminal disc protrusion at L2-L3. (*Id.*) Munoz stated that she had herniated three discs in a work incident in 2007. (AR 13,

4

256.) She saw Baska for chronic back pain in 2008. (*See* AR 257, 260.) Baska prescribed oxycodone and hydrocodone to alleviate the pain. (AR 257, 260.) While Munoz stated in March 2008 that her pain was limiting her ability to go for walks and play with her grandchildren to the extent she would like, by April 2008 she reported that her pain management and sleep had improved. (AR 257, 260.)

In mid-2009, Munoz visited Dr. Wendler for epigastric and right upper quadrant pain that was worse with activity and described as "sharp like ripping insides like Braveheart." (AR 340.) A CT of the abdomen and pelvis revealed minimal hepatic accumulation of fat in the liver and minimal colonic diverticulosis. (AR 296.) On August 11, 2009, Dr. Wendler performed an upper gastrointestinal endoscopy, stomach biopsies, and a colonoscopy to the cecum. (AR 343.) Dr. Wendler diagnosed Munoz with mild gastritis. (AR 344.)

In early 2010, Munoz complained to Dr. Clancy of chronic lower back pain that was unresponsive to conservative treatment, as well as shoulder pain. (AR 314, 367.) In her function report dated February 15, 2010, Munoz claimed that she could not bend over to shave her legs and that she had to brush her teeth in the shower because she could not bend over the sink. (AR 208.) In undated disability reports, Munoz also wrote that she could not tie her own shoes, had trouble dressing and brushing her hair, and could not bend down to wash her feet. (AR 229, 237.) A thoracic spine x-ray taken on March 27, 2010, showed moderate degenerative disc disease, focally pronounced at T9-T10, with an associated moderate-sized osteophyte extending laterally on the left side at the same level. (AR 351.) On April 5, 2010, Dr. Clancy diagnosed Munoz with radiculopathy, mastalgia, hypertriglyceridemia, dyslipidemia, impaired glucose tolerance, vitamin D deficiency, and abnormal liver function tests. (AR 370.) Dr. Clancy noted that treatment options for radiculopathy included a trial epidural steroid injection. (*Id.*) Dr. Clancy

recommended that to deal with impaired glucose tolerance and prediabetes, Munoz ought to decrease carbohydrates, increase proteins and vegetables, walk daily, and lose ten percent of her body weight. (AR 370-71.) As of January 15, 2010, Munoz weighed 228 pounds. (AR 254.)

On April 10, 2010, Jose Ruben Ayala, M.D., performed a disability determination examination on Munoz. (*See* AR 320-323.) Dr. Ayala found that Munoz's spine was straight, though she complained of tenderness to palpation in the dorsal and lumbar area. (AR 322.) Her gait was normal, as well as her grip, with strength 5/5. (*Id.*) Munoz's range of motion exam was normal for her elbow, forearm, wrist, shoulder, cervical spine, hip, knee, and ankle. (*Id.*) Munoz stated that she could not perform lumbar spine or lateral flexion. (*Id.*) She could, however, perform straight leg raises in both supine and sitting positions without problems as well as roll to her side. (*Id.*) Munoz could not walk on her heels or squat due to back pain, but she could walk heel to toe. (*Id.*) Dr. Ayala did not find any neurological symptoms or signs of radiculopathy, and although Munoz claimed to have chronic insomnia, he found that she looked very rested and fresh at the time of the exam. (*Id.*)

On May 24, 2010, John Pataki, M.D., a medical consultant, completed a physical RFC assessment. (*See* AR 324-31.) Dr. Pataki found that Munoz could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push or pull with limitations as to the upper extremities. (AR 325.) He also found that Munoz could frequently balance and occasionally climb ramps, stairs, ladders, ropes, or scaffolds, stoop, kneel, crouch, or crawl. (AR 326.) Dr. Pataki noted that Munoz reported doing light household chores such as washing dishes, doing laundry, and mopping, but that she had problems completing tasks involving heavy weight due to lifting restrictions and she needed help moving

6

and carrying items. (AR 329.) He found these statements to be consistent with the medical findings and fully credible. (*Id.*)

Munoz returned to Dr. Clancy on July 27, 2010, for continued back and shoulder pain. (AR 376.) Dr. Clancy noted that Munoz now had mid-back pain in addition to lower back pain. (*Id.*) She referred Munoz to physical therapy. (*Id.*) Dr. Clancy noted at that visit as well as at several other visits that Munoz was alert and oriented, in no acute distress, and she moved easily and comfortably to and from the exam table. (AR 376; *see* AR 315, 382, 388, 391, 399, 401, 427.) On August 11, 2010, Dr. Clancy provided Munoz with an injection of Kenalog in her shoulder. (AR 381.) Munoz claimed that physical therapy was helping her back at that time. (*Id.*) However, Munoz visited Karen Degenevieve, CFNP, on August 23, 2010, and asserted that her physical therapy was not in fact alleviating her back pain. (AR 379.) Munoz weighed 231 pounds at that visit. (*Id.*) Degenevieve found Munoz to be obese, and she noted decreased hand strength in Munoz's right hand as well as numbness and tingling. (*Id.*) Degenevieve ordered an MRI for Munoz. (*Id.*)

On August 25, 2010, Dr. Clancy saw Munoz for her obesity. (AR 384-85.) Munoz weighed 227 pounds. (AR 385.) Dr. Clancy encouraged Munoz to completely eliminate fatty foods, continue daily exercise increasing to thirty to forty minutes daily, and eliminate all snacks from the house. (AR 384.) Dr. Clancy wrote that Munoz was interested in weight loss medication, which could be used for only three months in conjunction with diet and exercise changes. (*Id.*) She prescribed Phentermine HCl for Munoz. (*Id.*) Furthermore, because Munoz said that her joint and shoulder pain had completely resolved, Dr. Clancy encouraged her to cancel the MRI ordered by Degenevieve. (AR 385.)

On September 20, 2010, N.D. Nickerson, M.D., reviewed Munoz's records. (AR 362.) He did not find that the images of T9-T10 exhibited signs of neurological deficits or radiculopathy, and he affirmed the RFC conducted by Dr. Pataki on May 24, 2010. (*Id.*) Dr. Nickerson also stated that she was capable of work at a light level of exertion. (*Id.*)

Munoz visited Dr. Clancy again on September 28, 2010. (AR 387-88.) Dr. Clancy increased Munoz's dosage of Phentermine and noted that she would check Munoz's weight in one month. (AR 387.) At this particular visit, Munoz had only lost two pounds since the prior month. (*Id.*) Dr. Clancy reminded Munoz that she could only take Phentermine for three months, and she again encouraged Munoz to begin routine exercise. (AR 388.) At her follow-up on October 28, 2010, Munoz weighed 226 pounds. (AR 391.) Munoz claimed that she had increased her exercise and had walked to her appointment that day. (*Id.*) Dr. Clancy recommended that Munoz continue on Phentermine. (*Id.*) She also discussed Senokot with Munoz, encouraged her to continue exercise and dietary management, and suggested that Munoz attend an information session on lap banding. (*Id.*) By March 25, 2011, Munoz was down to 222 pounds, and Dr. Clancy recommended that Munoz eliminate breakfast sweets. (AR 399.)

Munoz returned to Dr. Clancy with pain under her right breast on May 16, 2011. (AR 400-01.) Dr. Clancy assessed her with abnormal liver function tests, disc disorder in the thoracic region, abdominal pain, and back pain. (AR 400.) She referred Munoz to physical therapy again to treat single-level thoracic disc disease at T9-10, radiculopathy mid-back and around the upper abdomen. (*Id.*) Dr. Clancy explained to Munoz that her abdominal pain could be caused by her T9-T10 disc disease or liver capsule swelling from probable fatty liver, but not from the accessory nipple because of its removal. (*Id.*)

Munoz informed Dr. Clancy on June 23, 2011, that her pain was worse after the physical therapy sessions. (AR 403.) Dr. Clancy assessed Munoz with radiculopathy and referred her to Cesar Velarde, M.D., to evaluate for a possible epidural steroid injection. (*Id.*) Munoz's weight at this visit was 224 pounds. (AR 404.) At a visit on September 6, 2011, Dr. Velarde noted that Munoz stated that her pain was reaching the point of being unbearable—8/10 most of the time— and that she had difficulty sleeping. (AR 422.) Dr. Velarde wrote that he believed Munoz was suffering from multilevel spine degeneration, and she had signs of cervical radiculitis. (AR 424.) He found clear signs of thoracic disc protrusion and radiculitis mainly in the T9-T10 area on the right and signs of disc protrusion at L3-L4. (*Id.*) Dr. Velarde prescribed Gabapentin, continued her on anti-inflammatory medication, and noted that he would consider muscle relaxants later. (*Id.*; *see* AR 427.) He wrote that he would also consider scheduling her for a thoracic epidural injection if possible as well as a transforaminal nerve root block, L3. (AR 424.) As of November 22, 2011, Munoz reported to John Flores, M.D., that the pain medication was working well. (AR 429.) On December 14, 2011, Dr. Flores referred Munoz for further physical therapy, specifically for pelvic stabilization. (AR 437.) At this visit, Munoz weighed 226 pounds. (*Id.*) An MRI taken on November 2, 2012, revealed degenerative disc change and facet arthropathy resulting in effects on the spinal canal and foraminal compromise at several levels. (AR 445.)

## HEARING TESTIMONY

The ALJ held a hearing on January 6, 2012, at which Munoz and Vocational Expert ("VE") Nicole B. King, M.R.C., C.R.C., testified. (AR 7.) Munoz was represented by an attorney at the hearing. (AR 7.)

Munoz testified that she receives state disability benefits and food stamps. (AR 12.) At the time of the hearing, Munoz weighed 230 pounds, and is 5'4" tall. (AR 13.) She testified that

she was injured at work in 2007, after which she received workers' compensation for a period. (*Id.*) Munoz asserted that her physical therapists and doctors never released her to go back to work. (*Id.*) She claimed that she was on a long-term treatment plan, where she might be able to go back to work in one to two years, though she would not be fully rehabilitated for ten years. (*Id.*; *see also* AR 30-31.) Explaining that her early attempts at physical therapy did not work, Munoz reflected that her more recent physical therapy—working from her pelvis on up—was helping a lot more. (AR 14.) She also testified that she was supposed to start tai chi to help her stretch. (AR 14-15.)

Shortly after her injury in 2007, Munoz had an injection in her back, but it gave her headaches. (AR 15.) Despite suggestions from doctors she later saw, Munoz never had another injection. (*Id.*) She stated that Dr. Velarde had discussed giving her injections, but she had not gotten an MRI necessary for him to see where to do the injections. (AR 16.)

Munoz characterized her current back pain as primarily mid-back, but she was working with a physical therapist to strengthen her core. (AR 17.) She described her pain as stabbing, shooting, and sometimes burning, leading to a place under her right breast and keeping her up at night. (*Id.*) For the last two years at least, Munoz slept only three to four hours per night. (AR 19.) During the day, she must lie down and put her feet up one to three times per day, for an hour and a half or sometimes more, as her legs swell. (*Id.*; AR 27-28.)

Munoz testified that her pain is worse with activities and that she does not do much during the day anymore. (AR 20.) She goes to physical therapy (AR 28), and once in a while, she goes to town with a friend, who helps her with grocery shopping (AR 20). Munoz stated that she could lift a half gallon of milk, but she could not lift a gallon of milk without pain, and she had to

use both hands. (*Id.*) For the last three years, her friend has been coming to Munoz's house to vacuum, help Munoz dress and do her hair, cook and freeze meals, and wash dishes. (AR 20-21.)

Munoz explained that she can only sit for about half an hour before she has to get up due to throbbing pain in her back, and when she stands, she tries to stand against a wall to ease the pain in her back. (AR 22.) Her friend drove her 140-150 miles to the hearing; they had to stop three times so that Munoz could stretch her legs and back. (AR 23.) Munoz does not drive at all herself due to the pressure on her back, and when she rides in the car, she reclines the seat as far as possible. (AR 23, 26.) Munoz testified that she can walk around the block, though she has to stop at least once because her hip starts to hurt. (AR 24.) Stairs make her legs hurt, and she has to take a break about every two stairs. (*Id.*) She has a hard time reaching up to brush her hair, and she cannot put a belt around her waist due to shoulder and back pain. (*Id.*) Munoz receives help putting on socks, tying her shoes, and shaving her legs, and she brushes her teeth in the showers so that she does not have to bend over. (AR 25.) Munoz also testified about trying to lose weight, which would help with the swelling in her feet and legs. (AR 28.)

Next, the VE asked Munoz to describe the type of work she did as a day laborer. (AR 33.) Munoz stated that she did whatever jobs she was assigned, including cleaning a golf course, working at a hotel, and cleaning windows. (*Id.*) The ALJ then asked the VE to assume a person with the same age, education, and work experience as Munoz and to consider the following limitations: sitting, standing, or walking up to six hours in an eight-hour workday; lifting or carrying up to twenty pounds occasionally and ten pounds frequently; no kneeling, crawling, squatting, climbing ladders, or working around unprotected heights; and only occasionally bending, stooping, or crouching. (AR 34.) The VE testified that such a person could perform

11

Munoz's past relevant work as a cashier. (*Id.*) The ALJ did not consider Munoz's work as a maid to be past relevant work because her position was only part time. (AR 35.)

The ALJ then asked the VE to assume that the cashier position was not past relevant work. (*Id.*) The VE testified that the hypothetical person could still perform work as a cashier, cleaner or maid, and fast food worker. (AR 36.) However, if this hypothetical person had to miss more than one day of work per month, that would eliminate competitive employment. (*Id.*)

Munoz's attorney next inquired whether the hypothetical person initially described could maintain work if the person were limited to lifting only five pounds occasionally and frequently. (*Id.*) The VE stated that there would be no work for such a person. (AR 37.) The attorney then asked whether such a hypothetical person who needed to take a break from sitting every half hour and could only stoop occasionally would have work available. (*Id.*) The VE concluded that such a person could not maintain competitive employment (*Id.*) Alternatively, if the hypothetical person were limited to only occasional reaching out or up, that would also eliminate competitive employment. (AR 38.)

### THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Munoz's application for benefits according to the sequential evaluation process. (AR 44-46.) At the first step, the ALJ found that Munoz had not engaged in substantial gainful activity since January 25, 2010, her application date. (AR 46.) Then, at the second step, the ALJ concluded that she suffers from the severe impairments of degenerative disc disease with radiculopathy and obesity. (*Id.*) At step three, the ALJ found that Munoz's combination of severe impairments did not equal one of the listed impairments. (*Id.*)

The ALJ then reviewed the medical evidence as part of step four and determined that Munoz has the RFC to sit, stand, or walk for up to six hours in an eight-hour workday; lift or

12

carry up to twenty pounds occasionally and ten pounds frequently; and occasionally bend, stoop, or crouch but never kneel, crawl, squat, climb ladders, or work around unprotected heights. (AR 47.) The ALJ acknowledged that Munoz alleges disability due to back and hip pain and that she claims her pain causes difficulty sleeping. (AR 48.) The ALJ noted Munoz's degenerative disc disease but remarked that her disease was only "moderate" and that Munoz had begun new methods of managing her pain, allowing her to walk more and play with her grandchildren. (*Id.*) In addition, the ALJ referenced Dr. Ayala's disability determination examination, pointing out Munoz's normal gait, grip, and range of motion for most areas of the body, as well as her fresh and rested appearance at the examination. (*Id.*) The ALJ also discussed two occasions in which Munoz's medical records indicated that she "moved easily to and from the exam table" and Munoz's statement that her pain medication was controlling her lower back pain "well." (*Id.*; AR 49.) The ALJ commented that, despite Munoz's back problems, there was no substantial evidence that Munoz required surgery, frequent emergency room visits, or increasingly large doses of narcotic medication or that she had any nerve compression, root compression, neurological deficits, or symptoms frequently observed in patients who suffer constant, unremitting pain that is unresponsive to therapy. (AR 49.) For example, the ALJ found that Munoz's daily activities were not limited to the extent one would expect given Munoz's complaints. (AR 50.) She also noted the essentially routine and conservative nature of Munoz's treatment and the fact that the record did not contain any opinions from treating or examining physicians indicating that Munoz is currently disabled. (*Id.*)

The ALJ discussed Munoz's obesity in relation to her RFC as well. (*See* AR 49-50.) The ALJ found that

13

despite the claimant's obesity, there is no substantial evidence that the claimant has excessive fatigue, blood (fat) lip abnormalities, gallbladder disease, metabolic syndrome, nonalcoholic fatty liver disease, skin problems, or stroke, all of which can be serious symptoms resulting from obesity. Thus, while the claimant's obesity may cause some exertional limitations, there is no evidence of limitations greater than those described in [the RFC].

(AR 50.)

The ALJ concluded that Munoz could perform past relevant work as a cashier and maid.[1] (AR 50.) Furthermore, the ALJ found in the alternative at step five that there are additional jobs existing in substantial numbers in the national economy that a person with Munoz's age, education, work experience, and RFC could perform, including cleaner and fast food worker. (AR 51.)

As the ALJ determined that Munoz could perform past relevant work and other jobs existing in substantial numbers in the national economy, the ALJ concluded that Munoz was not eligible for benefits. (AR 52.) Munoz appealed the decision to the Appeals Council, but the Council found that Munoz's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-6.)

## DISCUSSION

Munoz raises three challenges to the ALJ's decision to deny SSI benefits. First, she argues that the ALJ erred at step three by failing to properly analyze and consider the effects of Munoz's obesity and whether it in combination with her other impairment met or equaled a listing. Second, she claims that the ALJ erred by failing to conduct a function-by-function

---

[1] This conclusion conflicts with the ALJ's statement in the hearing that she would not consider Munoz's work as a maid to be past relevant work. (*See* AR 35.) However, Munoz does not assert any error arising from this discrepancy.

14

analysis related to substantial evidence at the RFC phase of step four. Finally, Munoz argues that the ALJ erred in failing to properly analyze and consider the effects of Munoz's obesity in making her RFC determination. I consider the obesity claims at both steps three and four together, followed by the function-by-function analysis claim of error.

## I.  Obesity Claims

Munoz acknowledges that the ALJ briefly discussed her back problems as they might apply under Listing 1.04, describing disorders of the spine. However, Munoz challenges the ALJ's discussion as "boiler-plate language," and citing *Clifton* and *Roberts*, she asserts that the ALJ failed to properly discuss and analyze whether her severe impairment of obesity and its combined effects with her back impairment met or equaled the severity of a listed impairment. *See Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996); *Roberts v. Callahan*, 971 F. Supp. 498 (D.N.M. 1997). Munoz also cites to Listing 1.00 Musculoskeletal System, section Q, of 20 C.F.R. pt. 404, Subpt. P, App'x 1, which instructs ALJs to consider any additional and cumulative effects of obesity on musculoskeletal impairments at step three and at later steps of the sequential evaluation process.

Munoz later argues that the ALJ failed to consider the effects of obesity specifically at the RFC stage of step four of the sequential evaluation process. She asserts that, pursuant to SSR 02-01p, "An assessment should . . . be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." 2002 WL 34686281, at *6 (Sept. 12, 2002). In addition, "[a]s with any other impairment, [the ALJ] will explain how [she] reached [her] conclusions on whether obesity caused any physical or mental limitations." *Id.* at *7.

15

A.  Step Three Obesity Considerations

Despite Munoz's argument that the ALJ failed to analyze the combined effects of her obesity on her degenerative disc disease with radiculopathy impairment, Munoz's own description of her back and obesity problems does not make this connection, either—likely because Munoz's physicians themselves never explicitly related the two impairments in the AR and therefore did not provide the ALJ with substantial evidence to connect the obesity and back problems. An ALJ may not "make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will evaluate each case based on the information in the case record." SSR 02-01p, 2002 WL 34686281, at *6.

When an ALJ is precluded from making assumptions about the effects of obesity on another impairment where the AR fails to make such a connection, the question remains to what extent an ALJ must discuss obesity, if at all, at step three. At step three in *Clifton*, the ALJ stated summarily that the claimant's impairments did not meet or equal any listed impairment. 79 F. 3d at 1009. He did not discuss any evidence or provide reasons for his conclusion that the claimant did not meet a listing, or even identify the pertinent listings. *Id.* The court held that the ALJ was required to discuss the evidence and explain why he found the claimant did not meet a listing at step three. *Id.* The court reasoned that it could not assess the ALJ's conclusion without findings supported by specific weighing of the evidence. *Id.* Likewise, in *Roberts*, the court remanded the case pursuant to *Clifton* where the ALJ concluded without discussion that the claimant's severe obesity did not equal a listed impairment. 971 F. Supp. at 501.

16

Similar to *Clifton* and *Roberts*, the ALJ in this case did not discuss any evidence or provide any reasons relating to obesity for her conclusion that Munoz did not have a listed impairment. (*See* AR 46-47.) Yet the Tenth Circuit limited its holding in *Clifton* in *Fischer-Ross*, where the court held that "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). The court found harmless error where "no reasonable factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id.* at 733-34. That is, where findings at a later step confirm the finding at step three, a more thorough discussion at step three is not required. *See id.* at 734. In *Fischer-Ross*, the ALJ's later findings regarding the extensive functionality of the claimant's upper extremities showed that the claimant could not have met a listing requirement at step three. *See id; cf. Murdock v. Astrue*, 458 F. App'x 702, 703-05 (10th Cir. 2012) (unpublished) (remanding the case because the ALJ did not discuss the evidence or make findings to support the conclusion that claimant's knee condition did not meet listing at step three or make conclusive findings in later steps). I must therefore analyze the ALJ's findings at subsequent steps in order to determine whether the ALJ erred at step three of the sequential evaluation process.

B.  Step Four Obesity Considerations

Munoz claims that at the RFC stage of step four, the ALJ merely recited some of the record as it related to degenerative disc disease with radiculopathy and failed to "provid[e] a bridge between" the back and obesity impairments. Munoz argues that "the ALJ must link her RFC determination with specific evidence in the record." Munoz acknowledges the ALJ's findings that there was no substantial evidence that Munoz suffered from certain obesity-related

symptoms,[2] yet she asserts that the ALJ "was still required to discuss specifically how she came to the RFC by discussing specific obesity related evidence that may support a different RFC. Furthermore, the ALJ only simply asserted that Ms. Munoz's obesity may cause some exertional limitations but did not identify those limitations or how she came to that finding."

The Commissioner responds that the RFC outlined by the ALJ represents Munoz's functional abilities taking into account both her severe degenerative disc disease and obesity. The Commissioner notes the ALJ's references to Munoz's normal gait, lack of need for an assistive walking device, ability to move on and off of an exam table easily, and Dr. Clancy's recommendation that Munoz exercise and increase her activity level.

Several cases have applied SSR 02-01p in order to analyze the adequacy of the ALJ's discussion of obesity in step four of the sequential evaluation process. In *Howard*, *Jimison*, and *Romero*, the claimants argued, like Munoz, that the ALJs failed to properly consider the effects of obesity on their ability to work. *Howard v. Barnhart*, 379 F.3d 945, 948 (10th Cir. 2004); *Jimison v. Colvin*, 513 F. App'x 789, 798 (10th Cir. 2013) (unpublished); *Romero v. Astrue*, 242 F. App'x 536, 542 (10th Cir. 2007) (unpublished). The court in *Howard* pointed out, however, that "the ALJ did discuss possible ramifications of [the claimant's] obesity when he addressed the lack of marked arthritic pain, joint deformity, or musculoskeletal impairment." *Id.* Furthermore, the court concluded that the claimant did not "discuss or cite to medical evidence about other areas which were impacted by her obesity." *Id.* The court therefore found that the record did not support claimant's argument that she was precluded from performing light work. *Id.* In *Jimison*, the claimant alleged that the sit or stand portion of the RFC did not take into

---

[2] Munoz contests whether there was substantial evidence that she suffered from obesity-related fatigue, but this is not the crux of her argument, which focuses instead on the ALJ discussing specific obesity-related evidence and how she reached her RFC.

account decedent's obesity. *Id.* The court found no error in the ALJ's decision, concluding that "there is no record indication of any functional limitations from [decedent's] obesity or of any impairments possibly caused or exacerbated by her obesity that are inconsistent with the RFC for a full range of sedentary work with a sit/stand option." *Id.* Finally, in *Romero*, the court noted that the claimant did not allege disability based on obesity, her physicians' diagnoses of obesity did not include any restrictions on her ability to work as a result of her obesity, and at the hearing the claimant did not attribute any of her functional limitations to obesity. *Id.* These considerations led the court to find that the ALJ did not err in determining that the claimant's obesity was not a severe impairment, as "there was no evidence that [obesity] had 'more than a minimal effect on [claimant's] ability to do basic work activities.'" *Id.* (citing SSR 02-01p, 2000 WL 628049, at *4).

Although Munoz cites to doctors' findings regarding her need to lose weight and increase physical activity, Munoz does not, as in *Howard*, reference evidence of any impact her obesity might have on other conditions, including disorders of the spine from Listing 1.04. (*See* AR 50.) In fact, the only evidence in the AR that evinces any connection whatsoever between obesity and functional impairments is Munoz's response to the ALJ's question about Munoz's understanding of the potential benefits of losing weight. (*See* AR 28.) Munoz replied that losing weight "would probably help my back somewhat, and it would help my – feet and my legs, the swelling – in my feet and my legs." (AR 28-29.) Despite this statement, none of Munoz's medical providers connected Munoz's obesity with other impairments such as to implicate a change in her RFC. As in *Jimison*, there is no evidence in the AR indicating functional limitations caused or exacerbated by obesity that are not already reflected in the RFC. *See* 513 F. App'x at 798. Furthermore, despite the ALJ's finding in this case that Munoz's obesity was a severe impairment, this case is

similar to *Romero* in that the claimant did not allege disability based on obesity (*see* AR 216), Munoz's physicians do not indicate anywhere in the record any work restrictions based on her obesity, and Munoz does not connect her brief comments about her swollen feet and legs to any specific functional limitations (*see* AR 27-29).

Given these findings, I conclude that the ALJ did not err in her consideration of the effects of obesity on Munoz's RFC. In addition, because the ALJ's findings at the RFC stage of step four confirm the ALJ's more conclusory findings at step three of the sequential evaluation process, I find harmless any error by the ALJ in finding that Munoz failed to meet one of the listed impairments.

## II.    Step Four Function-by-Function Analysis

Munoz argues that the ALJ failed to conduct a function-by-function analysis related to the medical evidence at the RFC determination stage of step four. Munoz cites SSR 96-8p for the proposition that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). As Munoz notes, these regulations require that the ALJ assess the claimant's abilities with respect to "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions . . . ." 20 C.F.R. § 416.945(b). Munoz also argues that her actual ability is far less than that indicated by the RFC, as the RFC is contrary to the record and fails to adequately consider her pain. Because I find that the ALJ erred in failing to conduct a function-by-function analysis, I do not reach these subsequent arguments.

SSR 96-8p requires that the ALJ consider each of the seven strength demands separately: sitting, standing, walking, lifting, carrying, pushing, and pulling. 1996 WL 374184, at *5. Further, the ALJ must provide a narrative discussion detailing how the evidence supports each conclusion and citing medical and nonmedical evidence. *Id.* at *7. This narrative discussion must "discuss the individual's ability to perform sustained work activities in an ordinary setting on a regular and continuing basis . . . and describe the maximum amount of each [strength demand] the individual can perform based on the evidence in the case record." *Id.* That is, the ALJ is required to tie evidence to the functional limitations in the RFC by separately considering each function and respective limitations. *See Guana v. Astrue*, No. 11-CV-02781-LTB, 2013 WL 316022, at *6 (D. Colo. Jan. 28, 2013) (remanding the case because the ALJ's discussion was too "general and sweeping . . . merely presenting [the] evidence and an evaluation of it does not bridge the gap between the evidence and the ultimate RFC determination").

In *Southard*, the court noted that the ALJ found that the claimant had an RFC for light work[3] and then included how much weight the claimant could lift or carry but did not specifically discuss the claimant's ability to sit, stand, walk, push, or pull. *Southard v. Barnhart*, 72 F. App'x 781, 784 (10th Cir. 2003) (unpublished). The court remanded the case because of the ALJ's failure to make all of the detailed findings required at step four. *Id.* at 785. Similarly, in *Diggdon*, the court found that the ALJ made a conclusory determination as to the RFC in stating that the claimant could perform light work that allowed her to change her position at will, and the court remanded the case for the ALJ to 1) specify the evidence he relied on to make his conclusion and 2) assess the claimant's ability to perform all seven strength demands. *Diggdon v.*

---

[3] SSR 96-8p also states that "[a]t step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' [or] 'very heavy'" ; a function-by-function analysis is required first. 1996 WL 374184, at *3. The RFC in this case does not use an exertional category but rather certain functional limitations. (AR 47.)

*Apfel*, 189 F.3d 477, at *3 (10th Cir. 1999) (unpublished table decision); *see also Alexander v. Barnhart*, 74 F. App'x 23, 28 (10th Cir. 2003) (unpublished) (finding that an RFC allowing light work did not separately consider the seven strength demands and that the ALJ failed to conduct a function-by-function assessment).

Despite the Tenth Circuit's adherence to the requirement that an ALJ discuss all seven strength demands, some cases have distinguished this requirement based on harmless error. In *Jimison*, the ALJ did not specify the amount of weight that the claimant could lift, but rather said that the claimant was limited to sedentary work. *Jimison*, 513 F. App'x at 792. However, sedentary work inherently involves lifting no more than ten pounds at a time. *Id.* The claimant testified that she could lift no more than five pounds. *Id.* Because the claimant could not point to any medical records limiting the claimant's lifting capacity, the court did not find reversible error in the ALJ's failure to specify all seven strength demands. *Id.* at 792-93. In both *Hund* and *Ren*, the courts found harmless error where the ALJ's narrative discussion covered extensively the claimant's ability to perform the seven strength demands, despite the ALJ's failure to include all seven strength demands in the actual RFC. *Hund v. Astrue*, No. 12-CV-01985-LTB, 2013 WL 5729960, at *4-5 (D. Colo. Oct. 21, 2013); *Ren v. Astrue*, No. 08-CV-01242-LTB, 2009 WL 3497785, at *6 (D. Colo. Oct. 29, 2009). Even if the ALJ had not analyzed all seven strength demands in his narrative discussion of the RFC, the court in *Ren* noted that such error would have been harmless because there was substantial evidence supporting the ALJ's findings at step five that the claimant had no limitations that would preclude him from light work. *Ren*, 2009 WL 3497785, at *6 (citing *Howard*, 379 F.3d at 949; *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004); *Murrell v. Shalala*, 43 F.3d 1388, 1389-90 (10th Cir. 1994)).

The cases finding harmless error are united by their reliance on SSR 96-8p's statement that "[i]t is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work." 1996 WL 374184, at *5. In *Ren*, the court stated, "As the ALJ found Plaintiff was unable to do past relevant work, the function-by-function analysis is less critical." 2009 WL 3497785, at *6; *see also Hund*, 2013 WL 5729960, at *5 (citing *Ren* for the same proposition); *Lee v. Colvin*, No. 12-2259-SAC, 2013 WL 4549211, at *3 (D. Kan. Aug. 28, 2013) (citing *Ren* for the same proposition as well).

The present case may be analyzed pursuant to the evaluative factors set forth above. The RFC contains limitations on five out of the seven strength demands: sitting, standing, walking, lifting, and carrying. (AR 47). There is no mention in the RFC of pushing or pulling limitations. (*Id.*) Nor does the RFC contain exertional categories such as sedentary, light, or heavy work that might compensate for missing strength demands in the RFC. (*Id.*) In her narrative discussion, the ALJ also failed to analyze the seven strength demands. The ALJ noted Munoz's degenerative disc disease, summarized the results of Dr. Ayala's consultative examination and Dr. Clancy's findings over multiple visits, commented that Munoz did not have any of the symptoms "frequently observed in the patient who suffers constant, unremitting pain which is totally unresponsive to therapeutic measures," and discussed the possible effects of obesity. (AR 48-50). The ALJ explained that Munoz's daily activities were not limited to the extent one might expect given her complaints, that her treatment had been routine and conservative, and that there was no indication from any of the treating or examining physicians that they found her disabled. (*Id.*) There was no reference to the seven strength demands throughout the ALJ's discussion. (*See* AR 47-50.) Instead, as in *Guana*, the ALJ's discussion is general and sweeping, presenting evidence

23

from a few of the sources and providing little evaluation. (*Id.*; 2013 WL 316022, at *6.) The ALJ in this case thus did not bridge the gap between the evidence and her RFC determination.

The question remains whether the ALJ's failure to include all seven functions in the RFC or to discuss these functions in her narrative discussion of the RFC constituted harmless error. Unlike in *Jimison*, where there were no medical records indicating limitations on the claimant's lifting capacity, Dr. Pataki's physical RFC assessment showed that Munoz is limited in the upper extremities with respect to her ability to push or pull. (AR 325; *see* 513 F. App'x at 792-93.) Dr. Nickerson later affirmed Dr. Pataki's findings. (AR 362.) Such an omission from step four could affect step five findings, precluding substantial evidence to support step five and rendering an error that cannot be held harmless at step four. *See Ren*, 2009 WL 3497785, at *6. Furthermore, this case is distinct from those cited previously on the topic of harmless error, as in this case, Munoz was found to be able to perform past relevant work. (AR 50.) *Cf. Ren*, 2009 WL 3497785, at *6; *Lee*, 2013 WL 4549211, at *3; *Hund*, 2013 WL 5729960, at *5. Based on the ALJ's failure to assess Munoz's work-related abilities on a function-by-function basis as required under SSR 96-8p and associated case law, I find grounds to remand this case.

CONCLUSION

The ALJ erred by failing to evaluate Munoz's RFC on a function-by-function basis. The ALJ neither mentioned all seven physical demands in the RFC nor sufficiently outlined her assessments of each demand in the narrative discussion associated with the RFC. Because the ALJ found that Munoz was able to perform past relevant work, I find a function-by-function assessment of Munoz's work-related abilities to be more critical. I grant the motion to remand with the instruction that the ALJ assess all seven physical demands on a function-by-function basis, with any demands not subject to limitation accounted for in a narrative discussion.

24

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

25

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.